No. 54.—John Killen, ex'r of James H. Killen, plaintiff in error, *vs.* Samuel H. Sistrunk and Wife, defendants.

[1.] A new trial will not be granted upon matters of fact, unless upon the most unequivocal evidence that injustice has been done the party complaining. Where, however, it is manifest to a reasonable certainty, that justice has not been done, as for instance, where gross mistakes appear in the calculation upon which the verdict was rendered, a new trial will be ordered.

[2.] If a paper, not in evidence, be delivered to the Jury by design, by the party in whose favor the verdict is returned, the verdict will be set aside, even if the paper is immaterial.

[3.] And where a paper, which is capable of influencing the Jury on the side of the prevailing party, goes to the Jury by accident, and is read by them, the verdict will be set aside, although the Jury may think that they were not influenced by such paper; *aliter,* where the paper is not read.

In Equity, in Houston Superior Court.    Motion for a new trial. Decided by Judge FLOYD, April Term, 1849.

On the 13th April, 1836, James H. Killen died testate, appointing John Killen his executor.   By his will, after making provision for his wife, he desired that all the remainder of his property, real and personal, be sold by his executor, on some day after the 1st January, 1837, as he might deem best.   The terms, one fifth cash, and the remainder in four annual instalments, with interest from the sale, so that one-fourth should fall due on 1st January of each year, till all was paid.   The interest on the instalments to be paid annually.   By a subsequent item, he desired, that after the collection of the amounts for which his property sold, his executor should lend out the money, before the court house door in the town of Perry, on the first Monday in January, at or to the highest bidder, for one year next succeeding the letting out.

The testator divided his whole estate between his four children, on their marrage or arrival at age, respectively.

John Killen qualified as executor, and sold the property, as pointed out by the will, on 8th January, 1836.

In 1844, Samuel H. J. Sistrunk, who married one of the daughters and legatees, and his wife, filed their bill against John Killen, for an account.   Among other things, the bill charged that John Killen, as executor, did lend out the money of the estate, at public outcry, at an average rate of interest per annum of 32 per cent.; that by renewals and private loans, he continued to keep the money of the estate at large usurious interest, from the date of the sale till the year 1843; that the executor had purchased negroes with the money of the estate, and afterwards sold them at large profits; that the returns of the executor were ambiguous, incomplete and untrue.   The bill contained other allegations of improper conduct, not necessary to the proper understanding of this case.

The answer admitted that the executor did lend out the money of the estate once at public outcry, and afterwards kept it out at the best interest he could get, but from the great hazard attending the public letting, he felt it his duty to abandon it.   The defendant admitted that he had received, in usurious interest upon the money of the estate, $5,825, and that the whole amount

Killen *vs.* Sistrunk and Wife.

of lawful and usurious interest received by him amounted to $12,624 75. The answer stated, that from the unsettled and embarrassed state of the people, during a part of the time, it was unsafe for him to lend out the money, and that large amounts were thus unemployed on his hands. The answer stated, that the returns of the executor were correct, and those returns embraced all the interest, lawful and usurious, collected by defendant; that in spite of his efforts to the contrary, he had sustained losses, mostly from purchasers at the sale subsequently becoming insolvent, to the amount of $3,600. The answer denied the purchase and sale of negroes, on speculation, with the money of the estate; averred the inability of defendant to state the amount or rate of interest received by him on each loan, but admitted that it varied from 8 to 30 per cent.

Upon the trial, complainant proved by William Holoman, that he borrowed $150 of John Killen, at 16 per cent.—renewed once at 20 per cent. James E. Duncan borrowed $5000, in February, 1847, at 10 per cent. Silas Rawls proved that the average interest, at the public letting, was from 25 to 27 per cent. which letting took place in 1838 or 1839. C. J. Staley borrowed 5 or $600, at 20 per cent.—renewed annually for 4 or 5 years. " At each renewal defendant always proposed to renew at what others paid him." Charles H. Rice testified, that *twenty per cent.* might be considered as an average rate paid in Houston County, during the years from 1837 to 1846. He was one of the purchasers at the sale of the money, and gave 18 or 20 per cent. Other testimony was before the Jury, on other points not necessary to be referred to.

The Jury returned a verdict for complainant for $4,521 25. Among the papers returned by the Jury, was a paper under the certificate of the Clerk of the Court of Ordinary, setting forth all the debits and charges against the defendant, without any of his credits or disbursements. This paper was not in evidence, nor offered in evidence.*

The Jury furnished to the counsel of both parties the following calculation, on which their verdict was rendered :

---

*It is due to the counsel to state, that there was no pretence or suspicion that this paper was intentionally sent out with the Jury.—[Rep.]

Paid estate of Cutts, $852+421 86 .............. $1,273 86
Inventory, $2,128 52—less bad debts, $281 27 .... 1,847 25
Interest at 8 per cent. to 1837—these items surplus .. 147 78

Amount of sale bill, $25,355 81÷5 ............. 5,071 16
Deduct Cutts' debt ........................... 1,273 86
                                              ————————
                                               3,797 30
Inventory, less bad debts ..................... 1,847 25
                                              ————————
Sale bill and inventory, available ............... 5,644 55
Interest at 16 per cent. to January, 1838 ......... 903 12

Interest and principal ....................... 6,547 67
Cotton sold in Savannah ............... $1,127 82
Cash on hand ........................   82 18
                                      ————————
                                       1210 00
Interest at 16 per cent. to January, 1838 ..  193 60
                                      ————————
                                       1,403 60  1,403 60
                                                ————————
                                                 7,951 27
Cotton of 1836 ...................... $768 07
Public house, &c ......................   31 10
                                      ————————
                                        799 17
Interest at 16 per cent. to January, 1838 ..  127 86
                                      ————————
                                        927 03   927 03
                                                ————————
                                                 8,878 30
Disbursements in 1836, $961 64, and '37, $5,984 80  6,946 44
                                                ————————
                                                 1,931 86
1st instalment, with 8 per cent. interest ........... 5,476 85
                                                ————————
                                                 7,408 71
Interest to 1839, at 16 per cent ................. 1,185 38
                                                ————————
                                                 8,594 09

Killen *vs.* Sistrunk and Wife.

| | | |
|---|---:|---:|
| Deduct disbursements of 1838................... | 1,991 | 46 |
| | | |
| | 6,602 | 63 |
| 2d instalment, with two years' interest, at 8 per ct.. | 5,883 | 54 |
| | | |
| | 12,486 | 17 |
| Interest to 1840, at 16 per cent.................. | 1,997 | 78 |
| | | |
| | 14,483 | 95 |
| Deduct disbursements for 1839.................. | 1,543 | 35 |
| | | |
| | 12,940 | 60 |
| One-half land sold in Lee...................... | 647 | 00 |
| | | |
| | 13,587 | 60 |
| 3d instalment, with three years' interest, at 8 pr. ct.. | 6,288 | 23 |
| | | |
| | 19,875 | 83 |
| Interest up to 1841, at 16 per cent.............. | 3,180 | 12 |
| | | |
| | 23,055 | 95 |
| Deduct disbursements of 1840.................. | 501 | 40 |
| | | |
| | 22,554 | 55 |
| 4th instalment, with 4 years' interest, at 8 per ct.... | 6,693 | 92 |
| | | |
| | 29,248 | 47 |
| Interest to 1842, at 16 per cent.................. | 4,679 | 74 |
| | | |
| | 33,928 | 21 |
| Deduct disbursements of 1841................... | 1,003 | 25 |
| | | |
| | 32,924 | 96 |
| Balance proceeds Lee land...................... | 600 | 00 |
| Proceeds stud colt and notes................... | 132 | 25 |
| | | |
| | 33,657 | 21 |
| Interest up to 1843, at 16 per cent.............. | 5,385 | 14 |
| | | |
| | 39,042 | 35 |

Killen *vs.* Sistrunk and Wife.

| | | |
|---|---:|---:|
| Deduct disbursements 1842 ..................... | 2,032 | 44 |
| | 37,009 | 91 |
| Int. to 1st paym't to compl. March 22, '43, at 8 pr. ct. | 680 | 32 |
| | 37,690 | 23 |
| Deduct commission on $7,127 85, at 10 per cent... | 712 | 98 |
| 4) | 36,977 | 25 |
| Distributive share of each legatee ................ | 9,244 | 31 |
| Deduct pay't to compl't, March 22, 1843 .......... | 2,613 | 91 |
| | 6,630 | 40 |
| Interest half month, at 8 per cent ................ | 22 | 10 |
| | 6,652 | 50 |
| Deduct payment to complainant ................... | 1,093 | 77 |
| | 5,558 | 73 |
| Interest 7 months, to November 8, 1843 ........... | 259 | 39 |
| | 5,818 | 12 |
| Deduct amount paid complainant ................. | 100 | 00 |
| | 5,718 | 12 |
| Interest 1 month, at 8 per cent .................. | 38 | 12 |
| | 5,756 | 24 |
| Deduct 2d payment made complainant ........... | 845 | 00 |
| | 4,911 | 24 |
| Interest for 1½ month at 8 per cent ............. | 49 | 11 |
| | 4,960 | 35 |
| Deduct payment made complainant, Jan. 22, 1844.. | 614 | 00 |
| | 4,346 | 35 |
| Complainant's interest in Ball debt ............. | 159 | 07 |
| | 4,505 | 42 |

Killen *vs.* Sistrunk and Wife.

| | | |
|---|---|---|
| Deduct complainant's part bad debts.............. | 750 | 00 |
| | 3,755 | 42 |
| Deduct excess paid complainant, Martha Ann..... | 334 | 13 |
| | 3,421 | 29 |
| Interest from Jan. 22, 1844, for 4½ years, at 8 per ct. | 1,231 | 60 |
| | 4,652 | 89 |
| Deduct com. on pay't to compt.................. | 131 | 66 |
| | $4,521 | 23 |

Commissions on several annual disbursements included and credit given defendant therefor."

The returns of the executor, which were in evidence before the Jury, were somewhat confused as to the amount he was entitled to as a credit, for the item charged as "Cutts' debt." The calculation of the Jury allowed all that was claimed by the defendant.

Counsel for defendant moved a new trial on the following grounds : among others—

1st. That the Jury disregarded the instructions of the Court, and the evidence, and in their account charged the defendant with compound interest upon the whole estate in his hands, at the rate of 16 per cent. per annum.

2d. The Jury disregarded the defendant's answer, responsive to complainant's bill, wherein he stated he had realized upon the funds of the estate $5,825, and no more, in usury and compound interest, and by their calculation charged him with a far greater sum—there being no evidence to contradict or disprove the answer.

3d. The Jury charged the defendant with 16 per cent. interest upon the whole amount ascertained to be in his hands at the beginning of each year, together with the receipts of the same, before deducting his disbursements, thereby charging the defendant with compound interest, at 16 per cent. on his necessary disbursements, and during the year 1843, charged interest from one disbursement to another.

4th. The Jury calculated interest at 16 per cent. on the whole estate, including bad and insolvent debts, and at the close of the

account, only deducted the principal of such bad debts, thereby charging the defendant with large sums of interest which he never realized.

5th. Because the Jury found contrary to equity and against law.

6th. Because the Jury had before them the beforementioned paper, which may have influenced their decision.

The Court granted a *rule nisi*, but on hearing a motion to make the rule absolute at April Term, 1849, refused to grant a new trial; at the same time ordering the complainant to enter a remitter on the verdict of the Jury, for the amount of the principal of the bad debts.

Upon deciding the said motion, the Court held, that from the answer of defendant, admitting he had charged high interest, ranging from 8 to 30 per cent. and from the evidence, the Jury were justified in striking an average, and charging defendant therewith, and especially as defendant had failed to show what per cent. he had realized, and upon what amount, and for what time.

To which several rulings and decisions of the Court, counsel for defendant excepted.

S. D. KILLEN, and T. R. R. COBB, representing S. T. BAILEY, for plaintiff in error.

E. WARREN and A. HAMMOND, for defendants in error.

*By the Court.*—LUMPKIN, J. delivering the opinion.

[1.] We have carefully examined the calculation of the Jury, upon which their verdict was rendered, and detect in it the most palpable mistakes. They charged the executor with the whole amount of assets which came to his hands, with interest thereon, at the rate of 16 per cent. compounded annually, without first deducting, at the beginning of each year, the amount of disbursements for the current expenses of the year. In one instance, i. e. in 1836 and 1837, the disbursements, amounting to $6,940 44, seem not to have been deducted till the end of the second year; so that there is one year's interest or more too much, at the rate of 16 per cent. on each item of yearly expenditure,

Killen *vs.* Sistrunk and Wife.

making in the aggregate, between two thousand and twenty-five hundred dollars.    In order to do justice both to the estate and the executor, the rule laid down in the leading case of *Granberry vs. Granberry*, (1 *Wash.* 246, 249,) was, that the executorial accounts ought to be closed at the end of each year, and interest allowed upon the balance, whether for or against the executor; but the Court ruled, that such interest ought not to be carried to the account of the succeeding years, so as to convert interest into principal; and this rule has been generally approved in subsequent cases.    See 3 *Munf.* 29.    It is only necessary to say, that it has been grossly disregarded in this finding.    Interest has been calculated on the receipts from the beginning of the year, the amount of the annual disbursement for the current year taken off, and the balance of interest, often running up to many thousand dollars, converted into principal, and made to bear interest again for the ensuing year, at the rate of 16 per cent.

Again, the amount of interest charged against the executor in the calculation of the Jury, is about $17,000.    From this, subtract the interest on the disbursements, as improperly computed, and it still leaves, say $15,000 of interest, on which the executor is entitled to ten per cent. commissions under the Statute; whereas, in the estimate, $700 only is credited, making thereby a difference against the executor of upwards of $800.    This, added to the other mistake, will show in these two prominent items alone, an error of more than three thousand dollars against the defendant.    This, of itself, would be ground enough to remand the cause for a new trial.

I will advert, briefly, to one other matter.    The Court, in its decision upon the motion for a new trial, directed a remitter to be entered on the decree by the complainant, for one-fourth of the amount of bad debts, lost by the executor.    The amount of bad debts, as appears from the answer, is $3000; one-fourth of which, viz: the share of the complainant, would be $750; but by an inspection of the calculation it will be seen that this sum is credited already by the Jury.    The record shows, that an order was subsequently passed, directing the sum of $336 82, to be written off the verdict, which is ascertained to be the precise difference between the decree and the report of Messrs. Rutherford & Pringle, the auditors appointed by the Court to investigate this matter

and report, pending the application for a new trial. We see nothing in the record to justify this order.

The error committed by the Jury, on this branch of the case, was this: in not allowing interest at the rate of 16 per cent. per annum upon the $750, from the time when these insolvent debts fell due, from which time the executor was made chargeable with that amount of interest in the calculation.

We have been called on, in the argument, to look through the entire transcript, voluminous as it is, to see whether there be not inaccuracies in favor of the executor, sufficient to set off those against him, so as to let the verdict stand, as in that event no injustice would have been done.

This would be devolving more labor and responsibility upon the Court than perhaps is legitimate or proper. Still we have, to the best of our ability, within the limited time allotted to us, looked through the bill, answer, exhibits and evidence, and the only discovery which we have made is, the probable error in the amounts credited to the executor, as having been paid by him to the heirs of Joseph Cutts, deceased. The Jury allowed him, at the outset of their calculation, $1,272 86, in addition to the sum of $1600 and upwards, included in his returns to the Ordinary, as having been paid on the same account. This was likely an oversight. It will be remarked, that James H. Killen was the executor of Joseph Cutts, and John Killen is both executor of James, and administrator, *de bonis non, cum testamento annexo*, of Cutts. We believe there is some mistake as to these disbursements. We are convinced that the executor did not advance $2,800 to the Cutts family out of the assets of James Killen's estate. We should not be surprised if, upon a thorough examination, the true credit dwindled down greatly below that sum. Still there is too much uncertainty surrounding this business to make it the foundation of any judgment, farther than to call particular attention to it in the future investigation which we shall *direct to* be instituted. The mystery and confusion which at present overhang and cloud it, can only be explained by extrinsic evidence. It is impossible to arrive at any satisfactory result from the records of the Ordinary. Proof can be procured as to the number of the Cutts family; which of them were paid off in whole, or in part, by James Killen, in his lifetime, and which by John Killen, since his brother's death. Whether or not any assets belonging

to the estate of Cutts came into the hands of John Killen, by reason of his representation of James Killen's estate, or otherwise, &c.

I would remark, that the basis of the calculation of the Jury is a very severe one. To charge a trustee with the whole amount of assets, which from time to time have come to his hands, amounting, altogether, to some $35,000, with 16 per cent. interest thereon, compounded annually, is a more stringent rule than I have ever known adopted, after a practice of near thirty years. I find none such in the books; and it is one which I must believe cannot fail to do injustice to the executor. Nor do we think the evidence adduced by the complainants, warranted the adoption of such a rule, in opposition to the sworn statement of the defendant in his answer, as to the actual amount of interest, legal and usurious, received by him. He agreed to be made chargeable with 8 per cent. interest, compounded annually, and $5,825 of usury.

Is a trustee liable for illegal profits ? If so, and it is recovered out of him, he should undoubtedly be indemnified by the *cestui que trust,* on account of his liability over to those from whom he has received it. Every dollar of this usury may be sued out of him. And had he continued to do as he commenced, and what he is now blamed for not doing, spread out in his annual returns the amount of usurious interest collected from each debtor, he would have furnished record evidence against himself, from which there could have been no escape. I repeat then, that if, upon the principle that the trustee is responsible for all he makes on the trust fund, *lawfully or otherwise,* it is sought to charge him beyond the amount admitted in his answer, it is incumbent on the complainants, to prove that he actually collected more. The fact that certain witnesses testify, that in transactions between them and the executor, he charged 16 or 20 per cent; and he stated that this was his usual rate ; and that this was the usual rate of interest in that section of the country, at the period when this estate was administered ; and that he sold money at auction, as directed by the will of the testator, at from 8 to 27 per cent. does not contradict necessarily, the answer of the defendant, as to the amount of usury actually received by him. To charge him with a larger sum than he admits he made, the testimony must show that he made more.

Under all the facts and circumstances of this case, we have con-

cluded that the following mode of settling the accounts of the executor, would be equitable, both to him and the distributees : Charge lawful interest on all the sums which come to his hands, compounding annually, first deducting at the beginning of the year, the amount of expenditure for the current year. Add to this the usury admitted to be due, with lawful interest thereon, from the time of filing the answer, unless the complainants can show, *by sufficient proof*, that the executor ought to be held responsible for a larger sum.

Even a rule so rigid as this, will deter many a prudent man—indeed, nearly the whole of that class of men, to whom it is most desirable that the management of estates should be entrusted—from undertaking the office of executor, administrator and guardian.

[2.] As to the 7th ground taken in the Court below, on the application for a new trial, viz : that the Jury had before them, a paper setting forth all the charges taken from his returns to the Court of Ordinary, against the executor, without any of his credits, and which was not in evidence on the trial, it is needless, perhaps, to consider it. It may not be amiss, however, to remark, that if a paper, not in evidence, is delivered to the Jury by design, by the party in whose favor the verdict is returned, the verdict will be set aside, even if the paper is immaterial ; and this, as a proper punishment for the party's misconduct. *State vs. Haskell*, 6 *N. H. R.* 360, 1. *Chitty on C. L.* 3*d Am. ed.* 633, 634, *and notes. Rex vs. Burdett*, 1 *Ld. Raym.* 148.

[3.] So, where a paper, which is capable of influencing the Jury, on the side of the prevailing party, goes to the Jury by accident, and is read by them, the verdict will be set aside ; although the Jury may think they were not influenced by such paper, it being impossible for them to say what effect it may have had on their minds. If it was not read, it is the same thing as though it had not been delivered. *Hix vs. Drury*, 5 *Pick. R.* 297.

The case of *Benson vs. Fish*, (6 *Greenl.* 141,) was very similar to this. A paper drawn up by the plaintiff, containing items and statements, exhibiting the amount of damages to which he claimed to be entitled, was passed to the Jury, with other papers in the case, although they did not regard it as evidence regularly before them. It was prepared by the plaintiff, to aid his counsel in the argument ; and there is reason to believe that it

Killon *vs.* Sistrunk and Wife.

went to the Jury, by mistake and accident. Nevertheless, the Court held, it furnished a well-founded objection to the verdict, as it was calculated to influence the decision of the Jury.

The case of *Sargent vs. Roberts,* (1 *Pick. R.* 337,) is a strong illustration of the solicitude with which every statement or communication with the Jury, not made in open Court, and in the presence, and with the knowledge of the parties or their counsel, is excluded. A new trial was granted, because the Judge, after the Court was adjourned, wrote a letter to the Jury, respecting the cause which had been committed to them, which he directed them to bring into Court with them, to be filed with the papers; and the substance of which, it was admitted, was wholly unexceptionable. The Court acted upon the opinion, *that any communication at all,* was improper, and that *for that reason,* the party against whom the verdict was, was entitled to a new trial.

New trials are sometimes indispensable for the purpose of obtaining the ends of substantial justice. But the important right of trial by Jury, should not be disturbed, unless upon the most unequivocal evidences of injustice to the party who complains; otherwise, the rights of the Jury would be literally transferred to the Courts, and they, instead of the Jury, would become the triers of facts, in contravention of one of the leading features, clearly expressed, in our political association. However, if it is manifest to a reasonable certainty, that justice has not been done, the Courts are bound to interfere and give the party another opportunity of having his cause re-examined, especially, where there have been contradictory verdicts, as in the present case, differing some seventeen hundred dollars in amount. *Walker,* 97.

Our determination is, therefore, to remand this cause, with the following instructions, to wit: 1. That it be referred to auditors, to be appointed by the Court, who shall hear testimony and report upon the case, and which report, when sanctioned by the verdict of the Jury, shall be final and conclusive, either party being at liberty to controvert any matter of law or fact contained therein, before said Jury. 2. That the auditors, in ascertaining the amount in the hands of the executor, charge him with the various sums which he has received from time to time, with eight per cent. interest thereon, compounded annually—first deducting therefrom the current expenses of each year; and in addition thereto, the usury admitted by the defendant in his answer to have been re-

ceived by him, with eight per cent. interest thereon, from the time when his answer was filed—unless it can be shown by sufficient testimony, that he has collected, and ought to be made chargeable with a larger amount. 3. That the fact that several witnesses testify, that they paid to the executor a certain rate of interest on loans, and that he stated that this was his customary charge, and that it was the rate of interest usually paid in that part of the country, at the period when these transactions took place; and that the executor sold money at public outcry, as directed by the will of the testator, at from 8 to 27 per cent. prem. does not necessarily controvert the answer of the defendant as to the amount of interest actually collected by him. 4. The auditors will direct their attention, particularly, to the various items in the returns of the executor alleged to have been paid out to the heirs of Joseph Cutts, deceased, and find which of these are legitimate credits in his favor, and which not.